**Micah D. Fargey** (OSB No. 096814)
micah@fargeylaw.com
FARGEY LAW PC
5 Centerpointe Drive, Fourth Floor
Portland, Oregon 97035
Telephone: (503) 946-9426
Facsimile: (503) 342-8332

Attorney for Plaintiffs
**Dr. Warren G. Roberts and Aspen
Spine and Neurosurgery Center, P.C.**

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **DR. WARREN G. ROBERTS, M.D. F.A.A.N.S.**, an individual, and **ASPEN SPINE AND NEUROSURGERY CENTER, P.C.**, an Oregon professional corporation, | Case No. 3:15-cv-1059 |
| Plaintiffs, | **COMPLAINT** |
| v. | (Race Discrimination, 42 U.S.C. §§ 1981, 1982, Conspiracy to Discriminate, 42 U.S.C. § 1985, Neglect to Prevent Discrimination, 42 U.S.C. § 1986, Intentional Interference with Economic Relations, Breach of Contract, Denial of Public Accommodation, ORS 659A.403, ORS 659A.406, Intentional Infliction of Severe Emotional Distress, Breach of the Duty of Good Faith and Fair Dealing, Unlawful Conspiracy in Restraint of Trade, ORS 646.725, 15 U.S.C. § 1, Attempt to Monopolize, ORS 646.730, 15 U.S.C. § 2) |
| **LEGACY MERIDIAN PARK HOSPITAL**, an Oregon non-profit corporation, d/b/a LEGACY MERIDIAN PARK MEDICAL CENTER, an Oregon assumed business name, **DR. FRANCISCO X. SOLDEVILLA, M.D.**, an individual, **NORTHWEST NEUROSURGICAL ASSOCIATES LLC**, an Oregon limited liability company, **DR. ROBERT L. TATSUMI, M.D.**, an individual, **DR. TIMOTHY L. KEENEN, M.D.**, an individual, **PACIFIC SPINE SPECIALISTS, LLC**, an Oregon limited liability company, **DR. ANDREW B. CRAMER, M.D.**, an individual, **DR. DAVID NAZEMI, M.D.**, an individual, **DR. BRENT EVETTS, M.D.**, an individual, **PETER MERSEREAU**, an individual, **DR. LEWIS LOW**, an | DEMAND FOR JURY TRIAL |

individual, **ROBERT L. TATSUMI,
M.D., LLC**, an Oregon limited liability
company, and **DOES 1-5**,

                Defendants.

        Plaintiffs Dr. Warren G. Roberts, M.D., F.A.A.N.S. ("Dr. Roberts"), and Aspen Spine

and Neurosurgery Center, P.C., for their complaint against the defendants, allege as follows:

## I.     INTRODUCTION

        1.       Dr. Roberts is an accomplished African-American neurological surgeon who

moved to the Portland area after beginning a successful practice in Colorado.  Dr. Roberts

applied for and obtained clinical privileges at a hospital operated by the lead defendant, Legacy

Meridian Park Hospital.  Dr. Roberts started a successful surgery practice at this hospital and

provided excellent care to his patients, quickly becoming the most popular neurological surgeon

at the hospital.  Three of the individual physician defendants, however, had maintained a

monopoly on neurological surgeries at the Legacy Meridian Park Hospital prior to Dr. Roberts'

arrival and hated that an African-American doctor was succeeding, in their mind, at their

expense.  After egregious displays of racism, these physicians conspired among themselves and

the other defendants to destroy Dr. Roberts' growing practice by, among other things, initiating a

sham peer review process that ultimately led to the loss of his clinical privileges and a vast

number of potential patients, as well as ongoing acts of retaliation that continue to the present.

## II.    PARTIES

        2.       Roberts is a resident of Clackamas County who practices medicine in multiple

counties in Oregon, including Clackamas, Washington and Multnomah Counties.

        3.       Plaintiff Aspen Spine and Neurosurgery Center, P.C. ("Aspen Spine," and with

Dr. Roberts, "Plaintiffs") is an Oregon professional corporation owned by Dr. Roberts with its

principal place of business in Tualatin.

        4.       Defendant Legacy Meridian Park Hospital ("LMPH"), d/b/a Legacy Meridian

Park Medical Center, is an Oregon non-profit corporation with its principal place of business in

Tualatin, where it operates the Meridian Park Hospital ("Meridian Park").  Defendant LMPH conducts business in Multnomah County.

5.      Defendant Dr. Francisco X. Soldevilla, M.D. ("Soldevilla") was at all material times a resident of Clackamas County.  Soldevilla has clinical privileges at Meridian Park and serves on the hospital's Surgery Department Executive Committee.

6.      Defendant Northwest Neurosurgical Associates LLC ("NNA") is an Oregon limited liability company with its principal place of business in Tualatin.  On information and belief, NNA conducts business in Multnomah County.  Defendant Soldevilla is a member of NNA.

7.      Defendant Dr. Robert L. Tatsumi, M.D. ("Tatsumi") was at all material times a resident of Clackamas County.  Tatsumi has clinical privileges at Meridian Park and serves on the hospital's Surgery Department Executive Committee.

8.      Defendant Dr. Timothy L. Keenen, M.D. ("Keenen") was at all material times a resident of Clackamas County.  Keenen has clinical privileges at Meridian Park.

9.      Defendant Pacific Spine Specialists, LLC ("Pacific Spine") is an Oregon limited liability company with its principal place of business in Tualatin.  On information and belief, Pacific Spine conducts business in Multnomah County.  Keenen is a member and/or owner of Pacific Spine.  On information and belief, Tatsumi is a former member of Pacific Spine.

10.     Defendant Dr. Andrew B. Cramer, M.D. ("Cramer") was at all material times a resident of Clackamas County.  Cramer has clinical privileges at Meridian Park, is the chair of the hospital's Surgery Department Executive Committee, and serves on the hospital's Medical Executive Committee.

11.     Defendant Dr. David Nazemi, M.D. ("Nazemi") is and was at material times the Medical Staff President at Meridian Park.

12.     Dr. Brent Evetts, M.D. ("Evetts") has clinical privileges at Meridian Park and, at material times, was the Medical Staff President at Meridian Park.

13.     Mr. Peter Mersereau ("Mersereau") is Director of Surgical and Interventional Services at Meridian Park.

14.     Dr. Lewis Low is and was at all material times the Chief Medical Officer of Legacy Health Systems.

15.     Robert L. Tatsumi, M.D., LLC ("Tatsumi LLC") is an Oregon limited liability company with its principal place of business in Tualatin.  On information and belief, Tatsumi LLC conducts business in Multnomah County.  Tatsumi is a member and/or owner of Tatsumi LLC.

16.     Does 1 through 5 are persons whose identity is as yet unknown to Plaintiffs, and whose identities may become known through discovery.

17.     Collectively, the individuals and entities described in paragraphs 4 through 16 are referenced collectively below as "Defendants."

## III.   JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1367.

19.     Venue in is proper in this Division and District under 28 U.S.C. § 1391(b) and LR 3-2, as all of the defendants reside within this District and a substantial portion of the events giving rise to the claims occurred in Multnomah, Clackamas, or Washington Counties, Oregon.

## IV.   FACTUAL ALLEGATIONS

### A.     Dr. Roberts' Background

20.     Dr. Roberts received his undergraduate degree, with honors, from the University of California, Berkeley, and his medical degree from the University of California, Los Angeles ("UCLA").  At UCLA, Dr. Roberts was awarded the full-tuition Aesculpian Dean's Scholarship. The scholarship is highly prestigious, as full-tuition scholarships are a rarity in the medical world.  Dr. Roberts is board-certified by the American Board of Neurological Surgery and is a member of the American Association of Neurological Surgeons, the Congress of Neurological Surgeons, and the North American Spine Society.  Dr. Roberts is a frequent presenter to medical and occupational organizations and is a published journal author.  Dr. Roberts has handled

hundreds of cases, including complex spine, vascular, tumor, and skull base procedures.  He has also participated in basic science research involving brain tumor gene therapy.

21.    Dr. Roberts performed his internship and residency at Oregon Health Sciences University ("OHSU"), serving as chief resident in the Department of Neurological Surgery from 2006 to 2007.  He was the first African-American neurological surgery resident to graduate in the history of OHSU.  During that time, Dr. Roberts served on the OHSU Patient Safety Committee and the OHSU Graduate Medical Executive Committee.  He then moved to Colorado to practice medicine.  In Colorado, Dr. Roberts served on the board, Medical Education committee, and Trauma committee of Avista Adventist Hospital.

**B.    Physician Defendants Begin Opposing Dr. Roberts' Work at Meridian Park**

22.    In late 2010, Dr. Roberts began speaking with Allyson Anderson, Chief Executive Officer of LMPH, about obtaining clinical privileges to practice medicine at Meridian Park.  At that time, and presently, Soldevilla, Tatsumi, and Keenen were the only spine surgeons other than Dr. Roberts with clinical privileges at Meridian Park.  Dr. Roberts also spoke with the hospital's outreach director and attempted to speak to Tatsumi.  Fearing competition, Tatsumi began making false statements about Dr. Roberts in an effort to taint his reputation and prevent him from working at Meridian Park.

23.    Before coming to Portland, Dr. Roberts had informal telephone conversations with Keenen and Soldevilla to see if the latter would be willing to provide coverage if Dr. Roberts began practicing at Meridian Park.  Coverage is vital to a doctor's ability to serve patients, as it ensures patients will be able to obtain medical care if the primary physician is unavailable.  Even though it is a common professional courtesy, both Keenen and Soldevilla refused to provide coverage for Dr. Roberts, at least in part because of Tatsumi's defamatory statements.  Keenen later falsely reported to Meridian Park staff that Dr. Roberts was "demanding" he provide coverage.  Dr. Roberts was eventually able to obtain coverage from a surgeon located at another hospital in North Portland.

24.    In the course of an initial conversation with Dr. Roberts, Soldevilla falsely informed Dr. Roberts that there was no demand for neurological surgeons at Meridian Park.

Soldevilla made this misrepresentation with the intent to dissuade Dr. Roberts from working at Meridian Park.  Concurrent with these misrepresentations, Soldevilla was attempting to have a friend of his, also a neurological surgeon, join him at Meridian Park.  When subsequently asked to provide call coverage for Dr. Roberts, Soldevilla stated that he intended to "get" Dr. Roberts and that Dr. Roberts should "watch out."

25.     Dr. Roberts came to Portland in March 2011.  He obtained clinical privileges at Meridian Park, Good Samaritan Hospital in Portland, and eventually Columbia Memorial Hospital in Astoria.  Dr. Roberts provides care at these hospitals as well as his own office adjacent to Meridian Park at Aspen Spine's facilities.  Dr. Roberts is the first African-American neurological surgeon to practice at Meridian Park.

**C.     Defendants Discriminate and Harass Dr. Roberts**

26.     Shortly after his arrival in Portland, Dr. Roberts met Keenen in person for the first time in the presence of a manager at Meridian Park.  When introduced to Dr. Roberts, Keenen refused to shake Dr. Roberts' hand, turned and walked away, and clearly muttered "nigger" towards Dr. Roberts.

27.     As shocked as he was by Keenen's use of a racial epithet, Dr. Roberts initially kept quiet because he wanted to build and improve relationships with his colleagues at the hospital, having already been treated as an unwelcome outsider, and feared being labeled as a troublemaker or of "rocking the boat."

28.     Dr. Roberts worked hard to establish his practice.  He made connections with primary care providers throughout the community and performed surgeries on many new patients.  As a result of the positive outcomes of the surgeries on these patients, Dr. Roberts received referrals from patients and their families by word of mouth and his growing reputation in the community.

29.     At a meeting of spine practitioners in July 2011, after Dr. Roberts had practiced in Oregon for only four months, the statistics showed that Dr. Roberts had rocketed to the top of the number of spine procedures performed at the hospital.  He was, as far as patients were concerned, the most popular neurological surgeon at Meridian Park.  Although never helpful,

Keenen, Tatsumi, Soldevilla, and Evetts all became openly hostile toward Dr. Roberts as he became more successful.

30.    Manifesting their hostility, Keenen, Tatsumi, and Soldevilla made false and/or derogatory statements regarding Dr. Roberts' skill and competence as a surgeon.  These statements were made to patients, referring physicians, and hospital staff repeatedly from approximately June 2011 to the present.

31.    On information and belief, Keenen, Tatsumi, and Soldevilla, when speaking with primary care physicians about Dr. Roberts, coupled disparaging remarks about Dr. Roberts' competence with statements discouraging these physicians from referring surgeries to Dr. Roberts.  As a result, referrals to Dr. Roberts' practice declined.

32.    Dr. Roberts had engaged with the hospital to participate in community outreach and education.  While this effort initially received support from Meridian Park, the support began to be withdrawn within a matter of months.  At the same time, Meridian Park continues to provide this kind of support to other physicians, including Keenen, Tatsumi, and Soldevilla.

### D.    Defendants Initiate a Sham Peer Review Process Against Dr. Roberts

33.    In October 2011, Dr. Roberts was informed that his care of a surgical patient was undergoing a "peer review" process at Meridian Park, initiated at Nazemi's request, under the supervision of the hospital's Medical Executive Committee.  This committee was investigating a lumbar surgery where the patient's clinical outcome was excellent and the patient completed a marathon a little more than a month after the surgery on his spine.

34.    Cramer is a member of the hospital's Medical Executive Committee and is the chair of the Surgery Department at Meridian Park, and has responsibility over determinations to initiate peer review of surgeons at the hospital.  The hospital has some triggers or standards for initiating peer review, but the patient's clinical outcome here did not cross the threshold for peer review.  At the urging of Cramer and Nazemi, the hospital reviewed Dr. Roberts anyway, after Evetts had been improperly influenced to pursue this peer review process.  Evetts threatened Dr. Roberts that the peer review process would negatively impact his standing and attempted to coerce Dr. Roberts into abandoning his Oregon practice.  Evetts could have, but chose not to,

have the peer review process removed from the hostile Meridian Park environment and performed at another institution.

35.     Cramer had a financial stake in the outcome of the peer review process.  He was at all material times a part-owner of South Portland Surgical Center, where Keenen and Tatsumi frequently perform medical procedures.  He also has a financial stake because he participates in, and is paid for services during, many of the surgeries performed by Keenen and Tatsumi. Keenen, Tatsumi, and Soldevilla, as direct competitors of Dr. Roberts, stood to gain financially from the imposition of sanctions on Dr. Roberts.  Tatsumi and Soldevilla have responsibilities relating to, and influence on, the peer review process because they are members of the hospital's Surgery Department Executive Committee.

36.     Meridian Park used an external physician to review Dr. Roberts' care of the patient.  The hospital, and Cramer, did not tell Dr. Roberts about the review until after it had been completed.  The hospital, and Cramer, also provided the external reviewer with incomplete records of Dr. Roberts' care.

### E.     Defendants Cause Dr. Roberts' Suspension of Privileges

37.     In October 2011, Meridian Park issued a "precautionary" suspension of Dr. Roberts' clinical privileges to perform lumbar surgeries.  Precautionary suspensions are extremely rare and are an extraordinary sanction against a practicing physician.  The hospital suspended Dr. Roberts despite the facts that Dr. Roberts met the standard of care and the patient achieved an excellent clinical outcome.

38.     Lumbar procedures account for a significant number of procedures performed by Plaintiffs and account for approximately 70% of Plaintiffs' revenue.

39.     On information and belief, the suspension was issued at the urging of Cramer and Keenen, and to and for the benefit of Keenen, Tatsumi, Soldevilla, and Cramer.  Evetts, for the benefit and at the behest of Keenen, Tatsumi, and/or Soldevilla, improperly influenced the peer review process in order to have Dr. Roberts suspended.

40.     Prior to suspending him, Meridian Park refused to allow Dr. Roberts the opportunity to explain or refute the allegations before its Medical Executive Committee.  In fact, Dr. Roberts was given no opportunity to address the allegations prior to being suspended.

41.     Subsequent to the suspension, Plaintiffs were forced by Evetts to cancel six pending surgeries.  Plaintiffs thereafter suffered a dramatic drop in appointments and referrals, all due to the unjustified and wrongful suspension of Dr. Roberts' privileges.

42.     During the precautionary suspension period, Meridian Park appointed an ad hoc investigating committee to review Dr. Roberts' clinical privileges.  The Medical Executive Committee interviewed Dr. Roberts and reviewed the ad hoc committee's recommendations. Keenen was aware of this secret proceeding and, upon information and belief, influenced the course of the proceeding.

43.     At the recommendation of the ad hoc committee, Meridian Park lifted the precautionary suspension that the peer review committee had put in place.  However, Meridian Park still imposed ongoing restrictions on Plaintiffs' ability to perform lumbar procedures, and imposed a requirement that Dr. Roberts have a proctor for his next five lumbar surgeries.

44.     Meridian Park stated to Dr. Roberts that the suspension and restriction were not final actions relating to Dr. Roberts' clinical privileges.  Thus, Meridian Park took the position that Dr. Roberts could not seek a hearing or pursue administrative remedies.

**F.     Defendants Continue to Undermine Plaintiffs' Practice and Business**

45.     On information and belief, starting in October and November 2011 and continuing at least through May 2012, Soldevilla, Keenen, Tatsumi, and Evetts made statements to persons affiliated with the peer review committee, ad hoc committee, and other reviewing bodies that Dr. Roberts' surgical skill and competency were "deficient."  These statements were false and were made with knowledge that they were false, or with reckless disregard of their truth or falsity.

46.     In November 2011, Meridian Park and Evetts made a written statement to a government agency that Dr. Roberts' surgical skill and competency were "deficient."   This

statement was false and made with knowledge that it was false, or with reckless disregard of its truth or falsity.

47.     Dr. Roberts made diligent efforts to obtain the services of a proctor.  However, Meridian Park and Evetts still failed to accept Dr. Roberts' proctoring arrangement for another six months.  Plaintiffs were precluded from performing lumbar procedures during that time.

48.     Meridian Park finally approved the proctor a mere two days after Dr. Roberts became board-certified by the American Board of Neurological Surgery and became a fellow of the American Association of Neurological Surgeons.  Although Plaintiffs could then perform some lumbar procedures with the proctor, Dr. Roberts' clinical privileges remained restricted.

**G.     The Peer Review Process Was Patently Biased, Inaccurate, Unfair and Discriminatory**

49.     The peer review process was affected by systemic racial bias.  Dr. Roberts was treated differently than other similarly situated physicians practicing at Meridian Park.  On multiple occasions, other physicians made errors resulting in poor clinical outcomes but suffered no consequences, while Dr. Roberts was subjected to a peer review process, month-long suspension, and year-long restrictions and proctoring requirement, and restriction of his practice by 70% even though he met the standard of care and based on a surgery that resulted in an excellent clinical outcome.  None of the defendant physicians who caused Dr. Roberts' suspension have ever had their privileges suspended, even though their patients have suffered outcomes including paralysis and death.  The only explanation for the severe sanction imposed on Dr. Roberts is his race.  Because Dr. Roberts is black, the hospital's medical staff was predisposed to believe that he was less competent than non-black physicians, and punished him more severely than it did non-black physicians.

50.     In one incident, Tatsumi inadequately performed a surgery, resulting in a poor clinical outcome for the patient.  The patient sought out Dr. Roberts, who repaired the damage.  Tatsumi then accosted the patient in her hospital room about her decision to change doctors, in violation of privacy laws.  She reported to Dr. Roberts that she felt very uncomfortable about

Tatsumi's visit.  Dr. Roberts brought the incident to the attention of Meridian Park management.
However, Tatsumi's clinical privileges were not affected by this incident.

**H.    Defendants' Ongoing Unlawful and Discriminatory Acts Continue Unabated**

51.    In another incident, Soldevilla called Dr. Roberts' office to investigate a second
opinion Dr. Roberts had rendered and a corrective surgery Dr. Roberts had scheduled for one of
Soldevilla's former patients.  Soldevilla would not have known about the subsequent opinion and
surgery without improper intrusion into the patient's medical records.  Soldevilla's threatening
manner during the call resulted in distress to the staff member of Aspen Spine who took the call.

52.    Similarly, in July 2013, Tatsumi's office interfered with Dr. Roberts' treatment of
a patient in his Astoria clinic.  Tatsumi's office attempted to schedule the patient in to his office
to evaluate a Magnetic Resonance Imaging report that Dr. Roberts had ordered.  The patient had
never been in contact with Tatsumi, and Tatsumi's office would not have known about the
patient's treatment status without improper intrusion into the patient's medical records.

53.    In an effort to serve more patients, Dr. Roberts entered into a Call Coverage
Agreement with Meridian Park for the emergency room.  Plaintiffs contracted with Meridian
Park to provide emergency room call coverage at a stipend of $500 per call date.  In general,
Plaintiffs have served on call approximately seven days per month, receiving monthly stipends of
$3,500.

54.    However, Meridian Park placed responsibility for the call coverage schedule with
Keenen and Pacific Spine.  Defendants Keenen and Pacific Spine deliberately scheduled Dr.
Roberts for call coverage at inconvenient and undesirable times, and deliberately limited the
amount of call consults available to Plaintiffs.

55.    Prior to March 2013, Plaintiffs were timely paid the stipends due to them under
the Call Coverage Agreement.

56.    For the months of March, April and May, 2013, Plaintiffs have provided seven
days of call coverage each month but were not timely paid the $10,500 due them under the Call
Coverage Agreement.

57.    Dr. Roberts raised concerns about patient safety and hospital cleanliness in a meeting with Allyson Anderson in August 2012, including crawling and flying insects in the operating room, problems with sterility of equipment, and defective lighting equipment. These concerns were ignored. When the discussion turned to racially discriminatory actions by Meridian Park staff and practicing physicians, Dr. Roberts was told that bringing matters to the attention of the Legacy Health System board was a "bad idea" since, in Ms. Anderson's words, "bad things happen" when "the board is involved."

58.    Dr. Roberts repeatedly requested to be included on hospital committees, noting the lack of diversity, but these requests were also ignored.

59.    Throughout the period from June 2011 to the present, Plaintiffs' patients have reported being treated like "second-class citizens" at Meridian Park. Defendants or their agents have failed to follow Plaintiffs' doctors' orders in chart records, have failed to notify the attending physician of patients' admission or discharge, have given incorrect or incomplete discharge instructions to Plaintiffs' patients, and have failed to protect the confidentiality of Plaintiffs' patients. In each instance, Plaintiffs' patients have been subjected to action that does not happen to patients of Keenen, Tatsumi, or Soldevilla.

60.    Doctors other than Dr. Roberts are given preferential access to hospital facilities and equipment at Meridian Park. For example, Keenen consistently obtains preferential use of the hospital's most up-to-date microscope. Additionally, Tatsumi and Keenen have received preferential scheduling of early morning surgeries, which the hospital has not made available to Dr. Roberts.

61.    In retaliation for Dr. Roberts' concerns about conditions at the hospital, and motivated by racial animus, Defendants encouraged, instigated or allowed Doe to make a complaint alleging that Dr. Roberts had engaged in misconduct during a surgery conducted in March 2013.

62.    Meridian Park conducted a formal investigation of the complaint despite the fact that it was made by a radiology technician sitting far from the operating table. None of the three people at the operating table corroborated the accusation.

63.     Despite the absurd nature of the claim, Defendants' investigation spread the accusation throughout the hospital and professional community, resulting in damage to Plaintiffs' reputation and business and in personal humiliation.

64.     Dr. Roberts was never informed of the investigation while it was in progress and never given an opportunity to address the allegations before they were spread throughout the professional community.  He was only told about the investigation in April 2013, after it had ended in his exoneration.

65.     At the time of the misconduct investigation, Dr. Roberts' clinical privileges were on "Active Provisional" status.

66.     In April 2013, Meridian Park renewed Dr. Roberts' privileges and removed the "Provisional" label from his active privileges.

67.     Dr. Roberts was not informed of the privilege renewal and the end of provisional status until May 2013, mere days before filing this action.

68.     Dr. Roberts has continued to the present to report repeated instances of unlawful and improper conduct at Meridian Park, the problems endangering patient safety, poor patient care, and abuse and disrespect of patients.  Dr. Roberts has also continued to report the instances of retaliation against his practice.  These reports were made to, among others, Low and Mersereau.  Despite their duty to remedy the situation, Low and Mersereau failed to act.

69.     Defendants have continued to retaliate and discriminate against Plaintiffs to the present day.  For example, in February 2015, Defendants caused Meridian Park to cut Dr. Roberts' time in the hospital's operating rooms in half.  Defendants have continued to foster a hostile environment in retaliation for Dr. Roberts' complaints, in part through use of Meridian Park's disciplinary process, and by initiating additional sham peer review proceedings, in an attempt to further harm Plaintiffs practice.

70.     As a result of Defendants' wrongful acts, including but not limited to the "precautionary" suspension of Dr. Roberts' clinical privileges, the false reports about Dr. Roberts, and the false statements about Dr. Roberts, Dr. Roberts and his business suffered and

continue to suffer damage including expenses to obtain proctoring services, damage to reputation, and losses of appointments, procedures revenues, and goodwill.

71.     Defendants reached a meeting of the minds, in or after June 2011, that they should pursue the goals of damaging Plaintiffs' business, damaging Dr. Roberts' reputation, and causing economic and non-economic harm to Plaintiffs.  In furtherance of their goals, Defendants engaged in the unlawful acts as alleged above.

72.     Defendants' joint and concerted actions constitute a civil conspiracy. Accordingly, all of the defendants are jointly and severally liable for all tortious actions taken in furtherance of the conspiracy's goals.

**I.     Scope of the Lawsuit**

73.     This is the second lawsuit Plaintiffs have filed against LMPH, Soldevilla, NNA, Tatsumi, Keenen, Pacific Spine, and Cramer.  These defendants currently claim that the first lawsuit, encaptioned *Dr. Warren G. Dr. Roberts, M.D., F.A.A.N.S. v. Legacy Meridian Park, Inc., et al.*, Case No. 3:13-cv-01136-SI, United States District Court, District of Oregon, was settled – a claim vigorously disputed by Plaintiffs and currently under consideration in that court. Plaintiffs are not attempting to re-litigate anything that is decided in connection with that case. Accordingly, Plaintiffs specifically exclude from this complaint any claims or damages subject to collateral estoppel against these defendants in that case.  This lawsuit, on the other hand, seeks damages for claims against Defendants that were not at issue, included, and/or resolved in that case, including claims against defendants not named in that lawsuit and for more recent unlawful conduct by all of the defendants.

**V.     CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**

**(Intentional Interference with Economic Relations)**

**(All Plaintiffs Against All Defendants)**

74.     Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

75.     With respect to all of the defendants, the actions including the "precautionary" suspension of Dr. Roberts' practice and the misconduct accusations and investigations were intended to, and did, disrupt economic and professional relationships between Plaintiffs and patients, doctors, and other referral sources.

76.     The defendants other than LMPH additionally took actions with the intent to disrupt Plaintiffs' contractual relations with Meridian Park, resulting in the breaches identified in the Second Claim for Relief.  These actions included derogatory statements made to patients, referring physicians, and hospital staff regarding Dr. Roberts; statements discouraging other physicians from referring their patients to Dr. Roberts; false statements regarding the need for neurological surgeons at Meridian Park; improper access to patient records in connection with treatment rendered by Dr. Roberts; interference with Dr. Roberts' patients; improper disciplinary proceedings; and loss of benefits at Meridian Park.

77.     Defendants' actions were undertaken by improper motives in that they were motivated by racial prejudice and by retaliation for reports of problems that endangered patient health and safety.

78.     Defendants' actions in, among other things, inciting, investigating and publicizing the false accusation of misconduct, and in directing primary care physicians not to refer cases to Dr. Roberts, were and are improperly motivated to retaliate for Dr. Roberts' efforts, including the filing of this action, to oppose the discriminatory restrictions and exclusions imposed on him.

79.     Defendants' actions were additionally improperly motivated by the desire to retaliate against Dr. Roberts for raising complaints about the cleanliness of hospital facilities and equipment, and by the desire to stop Dr. Roberts from talking about these issues.

80.     Defendants' actions were undertaken through the improper means of false reporting, misrepresentations, and violation of laws, regulations and policies protecting patient privacy.

81.     As a result of Defendants' interference, including but not limited to the "precautionary" suspension of  Dr. Roberts' clinical privileges and the hospital's breach of the

call contract, Plaintiffs' business suffered damage including expenses to obtain proctoring services, damage to reputation, and losses of appointments, procedures revenues, and goodwill.

82.     To the extent any particular defendant is not directly liable, that defendant is vicariously liable for any actions of the other defendants which were made on their behalf or with apparent authority to act on their behalf.

**SECOND CLAIM FOR RELIEF**

**(Breach of Contract)**

**(All Plaintiffs Against LMPH)**

83.     Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

84.     Meridian Park's bylaws constitute a contract between LMPH and Plaintiffs. However, Dr. Roberts was not provided a copy of the bylaws until approximately December 2012.

85.     The failure to allow Dr. Roberts to explain, discuss or refute the allegations leading to his suspension of privileges constitutes a violation of the bylaws and a breach of contract.

86.     The suspension of Dr. Roberts was not due to concern about patient safety but rather was caused by racial bias and a desire to drive Dr. Roberts from the facility.  This constitutes a breach of the bylaws and of contract.

87.     The peer review process violated the bylaws' prohibition on conflicts of interest, as it included at least one member, Cramer, with a financial interest in the South Portland Surgical Center, which is a direct competitor of Plaintiffs and where Cramer, Tatsumi, and Keenen perform some of their practices.

88.     The racially-motivated suspension and subsequent restriction of Dr. Roberts' clinical privileges breached the bylaws' provisions requiring nondiscrimination in the administration of clinical privileges.

89.     LMPH's intentional direction of call coverage away from Dr. Roberts is a breach of the Call Coverage Agreement.

90.     LMPH also breached the Call Coverage Agreement by failing to pay stipends owing for March, April and May, 2013.

91.     LMPH also breached its contractual obligations to Plaintiffs by failing to investigate Dr. Roberts' allegations relating to discrimination and patient safety and by eliminating rights to practice at Meridian Park.

92.     Plaintiffs have been damaged by LMPH's breaches due to losses including lost patients, appointments, goodwill, and revenue.

## THIRD CLAIM FOR RELIEF

### (Breach of the Duty of Good Faith and Fair Dealing)

### (All Plaintiffs Against LMPH)

93.     Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

94.     Each contract described herein carries with it an implied duty of good faith and fair dealing.

95.     Defendants' campaign of racial harassment and discrimination against Dr. Roberts constitutes a violation of this implied duty in addition to a violation of the applicable contracts.

## FOURTH CLAIM FOR RELIEF

### (Denial of Public Accommodation, ORS 659A.403, ORS 659A.406)

### (Plaintiff Dr. Roberts Against All Defendants)

96.     Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

97.     ORS 659A.400 defines a "place of public accommodation" as "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements or otherwise."

98.     With respect to the segment of the public that is licensed to practice medicine, clinical privileges constitute privileges offered to the public under ORS 659A.400.  In relation to physicians seeking clinical privileges, Meridian Park is a place of public accommodation under the Oregon Equality Law, ORS 659A.400 to ORS 659A.409.

99.     ORS 659A.403(1) establishes that "all persons within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of any

place of public accommodation, without any distinction, discrimination or restriction on account of race [or] color . . . ." ORS 659A.403(3) additionally provides that "[i]t is an unlawful practice for any person to deny full and equal accommodations, advantages, facilities and privileges of any place of public accommodation in violation of this section."

100.    All physicians, regardless of race, are entitled to full and equal access to clinical privileges at Meridian Park.

101.    ORS 659A.406 forbids "any person to aid or abet any place of public accommodation . . . or any employee or person acting on behalf of the place of public accommodation to make any distinction, discrimination or restriction on account of race [or] color . . . ."

102.    Defendants other than LMPH specifically caused the suspension of privileges to Dr. Roberts, and incited Doe and others to accuse Dr. Roberts of misconduct, for racially discriminatory reasons.

103.    By acting upon the racially-motivated recommendations of the other defendants in restricting Dr. Roberts' privileges, LMPH has aided and abetted discrimination by those defendants.

104.    The hospital's peer review process was slanted against Dr. Roberts due to systemic racial bias. Defendants' actions have unlawfully restricted Dr. Roberts' access to Meridian Park on the basis of race. Dr. Roberts has been damaged by these discriminatory actions in ways including lost revenues, profits, goodwill, and referrals, damage to reputation, and emotional distress.

105.    By their participation in the discriminatory peer review process, defendants other than LMPH aided and abetted the hospital's discriminatory actions.

106.    To the extent any particular defendant is not directly liable, that defendant is vicariously liable for any actions of the other defendants which were made on their behalf or with apparent authority to act on their behalf.

## FIFTH CLAIM FOR RELIEF

### (Intentional Infliction of Severe Emotional Distress)

### (Plaintiff Dr. Roberts Against All Defendants)

107.    Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

108.    On information and belief, Defendants' ongoing racially motivated campaign against Dr. Roberts was conducted with the intent to cause Dr. Roberts severe emotional distress.

109.    Defendants' racial discrimination and vulgar expressions thereof, and false accusations of misconduct, constitute conduct that is an extraordinary transgression of the bounds of socially tolerable conduct and that exceeds any reasonable limit of social toleration.

110.    Defendants' actions have caused Dr. Roberts to suffer severe emotional distress.

111.    Defendants including LMPH, Pacific Spine, Northwest Neurological, and Tatsumi LLC, have received economic benefit from the actions that caused Dr. Roberts severe emotional distress.

112.    To the extent any particular defendant is not directly liable, that defendant is vicariously liable for any actions of the other defendants which were made on their behalf or with apparent authority to act on their behalf.

## SIXTH CLAIM FOR RELIEF

### (Unlawful Conspiracy in Restraint of Trade, ORS 646.725, 15 U.S.C. § 1)

### (All Plaintiffs Against All Defendants)

113.    Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

114.    ORS 646.725 and Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibit contracts, combinations, or conspiracies in the restraint of trade.

115.    On information and belief, Defendants intentionally conspired together in an effort to restrain Plaintiffs from practicing their trade at Meridian Park.  After realizing that Dr. Roberts was succeeding in the market for neurological surgery, Defendants worked in concert to ensure that the "peer review" process and other retaliatory acts would result in negative economic impacts on Plaintiffs.  Defendants worked in concert to ruin Dr. Roberts' reputation and restrain Plaintiffs' business by instigating and spreading false rumors and claims of

misconduct.  Defendants also conspired to reduce referrals from primary care physicians to Dr. Roberts.

116.    Defendants' anti-competitive actions have injured competition because they have reduced the quality of neurological surgery services available in the market, including Meridian Park.

117.    To the extent any particular defendant is not directly liable, that defendant is vicariously liable for any actions of the other defendants which were made on their behalf or with apparent authority to act on their behalf.

## SEVENTH CLAIM FOR RELIEF

### (Attempt to Monopolize, ORS 646.730, 15 U.S.C. § 2)

### (All Plaintiffs Against Soldevilla, Tatsumi, Keenen, Cramer, Northwest Neurological, Pacific Spine, and Tatsumi LLC)

118.    Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

119.    Soldevilla, Tatsumi, Keenen, Cramer, Northwest Neurological, Pacific Spine, and Tatsumi LLC are participants in the market for spine and neurological surgery in the area served by Meridian Park.  The market for spine and neurological surgery is a distinct and limited market within the area served by Meridian Park.  The market is of such small size that full privileges at Meridian Park are necessary to compete effectively.

120.    Accordingly, there is a dangerous probability that these defendants' attacks on Plaintiffs' business will enable them to achieve monopoly power in the market for neurological services in the area served by Meridian Park.

121.    These defendants' anticompetitive actions, on information and belief, were taken with the specific intent to monopolize the relevant market.

122.    These defendants' attempted monopolization is an act prohibited by ORS 646.730 and Section 2 of the Sherman Act, 15 U.S.C. § 2.

123.    These defendants' anti-competitive actions have injured competition because they have reduced the quality of neurological surgery services available in the market including Meridian Park.

## EIGHTH CLAIM FOR RELIEF

### (Conspiracy to Discriminate, 42 U.S.C. § 1985)

### (Plaintiff Dr. Roberts Against All Defendants)

124.    Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

125.    All citizens of the United States are entitled to equal rights to property and in contract.  42 U.S.C. §§ 1981 and 1982.

126.    Defendants concertedly deprived Plaintiffs of clinical privileges, revenues and contractual rights via a racially-biased peer review process and other means.  These overt acts evidence a conspiracy to deprive Plaintiffs of equal privileges or immunities under the laws, in violation of 42 U.S.C. § 1985(3).

127.    Defendants' actions have injured Plaintiffs in their person and property, including by loss of revenues, loss of profits, damage to reputation, and emotional distress.

## NINTH CLAIM FOR RELIEF

### (Race Discrimination, 42 U.S.C. §§ 1981, 1982)

### (Plaintiff Dr. Roberts Against All Defendants)

128.    Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

129.    All citizens of the United States are entitled to equal rights to property and in contract.  42 U.S.C. §§ 1981 and 1982.

130.    Defendants' actions improperly deprived Dr. Roberts of contractual and property rights because of Dr. Roberts' race.  These deprivations included Dr. Roberts' clinical privileges and contractual rights between Plaintiffs and Meridian Park and Plaintiffs' patients.

131.    As a result of Defendants' actions, Dr. Roberts has been damaged, including from lost revenues, profits, goodwill, and referrals, damage to reputation, and emotional distress.

## TENTH CLAIM FOR RELIEF

### (Neglect to Prevent Discrimination, 42 U.S.C. § 1986)

### (All Plaintiffs Against LMPH, Tatsumi, Pacific Spine, Evetts, Low, Mersereau, Nazemi, and Tatsumi LLC)

132.    Plaintiffs incorporate the foregoing paragraphs as though alleged fully herein.

133.    Under 42 U.S.C. § 1986, a person who has actual or constructive knowledge of and neglects to prevent acts prohibited by 42 U.S.C. § 1985 is liable for damages resulting from the acts.

134.    Defendants LMPH, Tatsumi, Pacific Spine, Evetts, Low, Mersereau, Nazemi, and Tatsumi LLC were aware, actually or constructively, of the discriminatory actions of the other defendants' or their own employees, contractors, or agents, had the ability to prevent the actions, and failed to prevent the actions.  The actions included the suspension and restriction of Dr. Roberts' clinical privileges, the direction of referrals away from him, the unsupported accusation of misconduct, the resulting investigation, and improper and unjustified discipline.  These defendants' failures to prevent discrimination violated 42 U.S.C. § 1986.

135.    Defendants' neglect has caused damages to Plaintiffs, including from loss of revenues, loss of profits, damage to reputation, loss of goodwill, and emotional distress.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment to be entered granting them relief as follows:

1.    Compensatory damages in an amount to be proven at trial;

2.    Statutory treble damages as authorized by ORS 646.780 and 15 U.S.C. § 15;

3.    Punitive damages in an amount to be proven at trial;

4.    Prejudgment interest;

5.    Plaintiffs' costs and disbursements herein, including reasonable attorney fees pursuant to statutes, including ORS 646.780, ORS 659A.885, 15 U.S.C. § 15, and 42 U.S.C. § 1988;

6.    A declaration that Defendants have engaged in unlawful restraint of trade and unlawful discrimination;

7.    An injunction precluding Defendants from engaging in such unlawful acts; and

8.    Such other and further relief as the Court may allow.

## VI.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all questions so triable.

## VII.    RESERVATION OF RIGHTS

Plaintiffs reserve their rights to amend or modify the allegations and claims herein on the basis of information received through discovery or otherwise.


Dated this 12th day of June, 2015.

/s/ Micah D. Fargey
Micah D. Fargey

Attorney for Plaintiffs